STATE of Maine

v.

Stanley B. JONES.

Supreme Judicial Court of Maine.

Argued Jan. 4, 1983.

Decided March 17, 1983.

Charles K. Leadbetter (orally), Asst. Atty. Gen., Augusta, for plaintiff.

Preti, Flaherty & Beliveau, Michael G. Messerschmidt (orally), Portland, for defendant.

Before NICHOLS, ROBERTS, CARTER, VIOLETTE and WATHEN, JJ.

CARTER, Justice.

After being charged with operating under the influence, 29 M.R.S.A. § 1312

(1981),[1] the defendant filed a motion to suppress the results of his blood-alcohol test. In his motion, the defendant argued that he had the right to consult with counsel before deciding whether to take a blood-alcohol test. After a hearing in District Court (Portland), the judge, based on the denial of right to counsel, granted the defendant's motion to suppress. Pursuant to 15 M.R.S.A. § 2115–A (1982), the State appeals the suppression of the defendant's blood test results. We sustain the appeal.

On the evening of April 9, 1982, a car driven by the defendant struck Police Officer Rizzo's personal car as he and a passenger, Police Officer Carpenter, both in uniform, were returning to the police station. The officers walked back to the defendant, who, according to Officer Carpenter, "seemed unaware" that he had hit the Rizzo car. The officers testified that they could smell the odor of alcohol on the defendant's breath, that his eyes were glassy and his voice, muffled. The defendant performed field sobriety tests poorly and had difficulty maintaining his balance. The officers arrested the defendant for operating under the influence and took him to the County Jail.

Officer Carpenter did not read the defendant any *Miranda* warnings. The officer did read the implied consent form to the defendant.[2] The defendant then asked to telephone his attorney. The request was denied. The deputies from the jail told the defendant that according to the policy of the Cumberland County Jail, a specifically ordered procedure is followed; a phone call is not allowed until four prior steps are accomplished. Officer Carpenter told the defendant that "it was not up to an attorney whether or not [to] take a blood or a breath test.... It was a decision that he had to make for himself." The defendant's blood test was administered approximately thirty minutes after the accident.

The defendant testified that he had intended to call a particular attorney when he requested to make a phone call. After the test was completed, the defendant was permitted a telephone call and was, in fact, successful in contacting that attorney.

At the time of the defendant's arrest, the beginning paragraphs of section 1312 provided:

> Any person who operates or attempts to operate a motor vehicle within this State shall be deemed to have given consent [3] to a chemical test to determine his blood-

1. Some of the 1981 amendments to § 1312 did not become effective until April 15, 1982, and were not, therefore, applicable to the defendant.

2. The implied consent form read to the defendant stated:
 1. You have been (arrested (summonsed) for
 ☐ operating a motor vehicle while under the influence of intoxicating liquor.
 ☐ attempting to operate a motor vehicle while under the influence of intoxicating liquor.
 2. By operating or attempting to operate a motor vehicle in this state you have, by law, consented to a chemical test to determine the alcoholic content of your blood.
 3. You are entitled to and may select either the blood or breath test to determine your blood alcohol level.
 4. I must inform you that if you refuse to take one of these tests your Maine driver's license and/or right to operate will be suspended for 180 days.

 5. I must inform you that if you refuse to take one of these tests your refusal will be admissible as evidence against you at any trial for operating under the influence of intoxicating liquor.
 6. The expenses for any test taken at my request will be paid for by the State.
 7. The results of any test taken will be made available to you or your attorney, if requested.
 8. The blood test, if selected, may be administered by a physician of your choice if the physician is reasonably available.
 If the driver refuses to submit to a test, he must acknowledge that he has been advised of the consequences of refusing a test by signing the form. The officer also signs, under oath, acknowledging that he informed the driver of the tests available and the consequences of a refusal.

3. On April 15, 1982, "be deemed to have given consent" was changed to "have the duty to submit." P.L.1981, ch. 679.

alcohol level by analysis of his blood or breath if there is probable cause to believe he has operated or attempted to operate a motor vehicle while under the influence of intoxicating liquor.

He shall be informed by a law enforcement officer of the tests available to him, and said accused shall select and designate one of the tests. At his request, he may have a test of his blood administered by a physician of his choice, if reasonably available. If the accused selects a breath test, the law enforcement officer may determine which type of breath test, as described in subsection 6, is to be administered.

29 M.R.S.A. § 1312 (1981). The statute provides that the refusal to submit to a blood or breath test is admissible in evidence at trial, § 1312(1), and results in license suspension. § 1312(2). Conviction for operating under the influence results in suspension of license and may include a fine and incarceration. § 1312–B.

The issue of the right to consult counsel before submitting to a blood-alcohol test is often raised under implied consent statutes. There is no clear majority rule.[4] The defendant argues for recognition of a *limited right*—opportunity is the better word—to consult with an attorney before the test decision is made. Although the defendant frequently cites the constitutional right to counsel under the United States and Maine Constitutions, he does not ask this Court for an absolute right to counsel.[5] Consequent-

4. The following courts have found, on various bases, a right to consult with an attorney: *City of St. Louis Park v. Bunkers,* 310 Minn. 431, 432, 247 N.W.2d 404, 404 (1976) (after arrest, police must accommodate timely request to telephone lawyer); *People v. Gursey,* 22 N.Y.2d 224, 229, 292 N.Y.S.2d 416, 419, 239 N.E.2d 351, 353 (1968) (no arrest, no *Miranda,* defendant's request to telephone particular attorney denied); *People v. Rinaldi,* 107 Misc.2d 916, 917–18, 436 N.Y.S.2d 156, 157 (1981) (constitutional right to consult with attorney if no significant or obstructive delay); *People v. Sweeney,* 55 Misc.2d 793, 795, 796, 286 N.Y.S.2d 506, 508–09 (1968) (distinguishing *Schmerber* on basis that New York law, unlike California law, permits right not to consent to test; defendant arrested and received *Miranda* warnings); *State v. Hill,* 277 N.C. 547, 551, 178 S.E.2d 462, 465 (1971) (state statute provides for communication with counsel and friends immediately upon arrest, detention, or deprivation of liberty); *City of Dayton v. Nugent,* 25 Ohio Misc. 31, 34, 36, 265 N.E.2d 826, 828, 830 (1970) (after arrest and *Miranda* warnings, defendant told he could not call attorney until after test, pursuant to police department policy); *State v. Welch,* 135 Vt. 316, 321–22, 376 A.2d 351, 355 (1977) (considering driver's right to refuse test, chemical test can rise to critical stage in serious criminal case); *State v. Fitzsimmons,* 93 Wash.2d 436, 448, 610 P.2d 893, 900, *vacated on other grounds,* 449 U.S. 977, 101 S.Ct. 390, 66 L.Ed.2d 240 (1980) (after arrest and *Miranda* warnings, defendant denied consultation with attorney even though drivers have *right to* refuse test).

Courts finding no right to consult with counsel include: *Copelin v. State,* 635 P.2d 492, 493 (Alaska App.1981) (no constitutional right to attorney when deciding whether to take test);

*Holmberg v. 54–A Judicial District Judge,* 60 Mich.App. 757, 760, 231 N.W.2d 543, 544 (1975) (arrested driver's test not critical stage); *Flynt v. State,* 407 P.2d 586, 588 (Okla.1973) (no right to counsel in choosing one of tests or refusing, after arrest and *Miranda* warnings); *State v. Newton,* 291 Or. 788, ——, 636 P.2d 393, 404 (1981) (not every evidence-gathering procedure is critical stage; defendant not formally charged); *Law v. City of Danville,* 212 Va. 702, 703, 187 S.E.2d 197, 198 (1972) (minimal risk that breath test procedure would derogate from right to fair trial).

5. We think that any claim to an absolute, constitutional right to consult with counsel before taking a blood-alcohol test would fail. The United States Supreme Court has found a right to counsel to protect the fifth amendment privilege against compulsory self-incrimination, *Miranda v. Arizona,* 384 U.S. 436, 444–45, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694, 706–07 (1966), and at critical stages of the prosecution in order to protect the defendant's sixth amendment right to counsel and right to a fair trial. *United States v. Wade,* 388 U.S. 218, 236–37, 87 S.Ct. 1926, 1937–38, 18 L.Ed.2d 1149, 1162–63 (1967). Because a blood-alcohol test does not violate the fifth amendment privilege against self-incrimination, *Schmerber v. California,* 384 U.S. 757, 761, 86 S.Ct. 1826, 1830–31, 16 L.Ed.2d 908, 914 (1966), the issue is, therefore, whether a blood-alcohol test is a "critical stage" of the prosecution.

The Court limited the scope of what constitutes a critical stage in *Kirby v. Illinois,* 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972). The Court stated:

The initiation of judicial criminal proceedings is far from a mere formalism. It is the

ly, he does not maintain that persons must be advised of the right to consult with counsel or that counsel must be appointed for indigent defendants. Essentially, the defendant contends that access to an attorney should be treated in the same manner as access to one's physician under section 1312: at the request of the person selecting a test, that person should be allowed to consult an attorney "if reasonably available." [6]

> starting point of our whole system of adversary criminal justice. For it is only then that the government has committed itself to prosecute, and only then that the adverse positions of government and defendant have solidified. It is then that a defendant finds himself faced with the prosecutorial forces of organized society, and immersed in the intricacies of substantive and procedural criminal law. It is this point, therefore, that marks the commencement the "criminal prosecutions" to which alone the explicit guarantees of the Sixth Amendment are applicable.

*Kirby,* 406 U.S. at 689–690, 92 S.Ct. at 1882, 32 L.Ed.2d at 417–18 (citations omitted). The Court ruled that a pre-indictment, post-arrest showup at the police station was not a critical stage.

Even before the *Kirby* limit was placed upon the critical stage analysis, the *Wade* Court, in finding that a post-indictment lineup was a critical stage, offered the following, perhaps more substantive, analysis:

> The Government characterizes the lineup as a mere preparatory step in the gathering of the prosecution's evidence, not different— for Sixth Amendment purposes—from various other preparatory steps, such as systematized or scientific analyzing of the accused's fingerprints, blood sample, clothing, hair, and the like. We think there are differences which preclude such stages being characterized as critical stages at which the accused has the right to the presence of his counsel. Knowledge of the techniques of science and technology is sufficiently available and the variables in techniques few enough that the accused has the opportunity for a meaningful confrontation of the Government's case at trial through the ordinary processes of cross-examination of the Government's expert witnesses and the presentation of the evidence of his own experts. The denial of a right to have his counsel present at such analyses does not therefore violate the Sixth Amendment; they are not critical stages since there is minimal risk that his counsel's absence at such stages might derogate from his right to a fair trial.

*Wade,* 388 U.S. at 227–28, 87 S.Ct. at 1932, 18 L.Ed.2d at 1157–58.

We find this reasoning persuasive. The legislative choice conferred on the OUI driver is whether to take a blood or a breath test. As the officer in this case told defendant Jones, that is a decision the defendant "had to make for himself." Although the test may seem critical because its results are so persuasive at trial, the test decision is not critical in the *Wade* sense. There is little counsel could do in making a test decision (or, even, during the administration of the test) for the defendant. The test is, in fact, a "mere preparatory step"; the officers, short of using improper test administration procedures or tampering with the specimen, can do nothing to impair the defendant's subsequent fair trial. If the officers do engage in such improper conduct, the defendant can effectively confront that aspect of the Government's case at trial.

**6.** The defendant relies on a recent federal case, *Heles v. South Dakota,* 530 F.Supp. 646 (D.S. D.), *vacated as moot,* 682 F.2d 201 (8th Cir. 1982), as support for this limited right to counsel. *Heles* involved two cases of challenge to administrative revocation of an operator's license under the South Dakota implied consent statute.

The *Heles* Court held that "due process demands that the person arrested for DWI has a constitutional right to request to speak with an attorney prior to making the decision whether to submit to testing." 530 F.Supp. at 653. The Court concluded that the administrative revocation of defendant Heles's driver's license was error because his request to call an attorney was treated as a refusal to take the test despite his timely consent. The Court upheld defendant Braunsreither's license revocation because he was allowed to telephone an attorney before his test but was unable to contact his attorney; his ultimate consent was untimely.

We find the *Heles* decision distinguishable on several grounds. First, the South Dakota statute provides for sobriety testing only after arrest. The Maine statute requires probable cause to believe the defendant has operated or attempted to operate under the influence. The language in the Maine statute suggesting that an arrest was required was deleted in 1981. P.L.1981, ch. 475. In its reasoning, the *Heles* Court noted the "conceptual problem" arising from arresting a person, giving the *Miranda* warnings, and then refusing access to counsel before a blood-alcohol test. 530 F.Supp. at 651. While the absence of that conceptual problem does not dictate the result in this case, it serves to require different analysis under the Maine statute.

Second, the *Heles* decision focuses on the effect of an uncounseled test refusal on the propriety of an administrative revocation of a driver's license. We do not here consider that issue.

■ We conclude that providing an opportunity for consultation with an attorney is not required by Maine's implied consent law. Moreover, provision of such consultation is not required by either the State or Federal Constitution.

The courts interpret the statutory law. But we interpret by determining the legislative intent of, and policy underlying, the particular legislation. The court considers the history and the policy of a statute in ascertaining the legislative intent. *State v. Bellino,* 390 A.2d 1014, 1021 (Me.1978). Once ascertained, either from the express and plain meaning of the statute or by judicial analysis, the intention of the legislative lawmaker determines the content of the statutory law. *State v. Taplin,* 247 A.2d 919, 922 (Me.1968).

Prior to the enactment of the original implied consent law, the administering of tests to determine blood-alcohol levels was on a voluntary and penalty-free basis.[7] In 1969, with the enactment of the implied consent statute, the law provided for license suspension of up to three months for a refusal to take one of the tests after an OUI arrest.[8]

The basis for the provision of this sanction is the Legislature's policy decision that upon a driver's refusal to submit to a blood-alcohol test, the State should forego the use of force to obtain a sample. Instead, the State "should rely upon the sanction of suspension to persuade arrested drivers to submit and to influence other drivers to maintain sobriety." *State v. Van Reenan,* 355 A.2d 392, 395 (Me.1976). As we have previously stated:

> The overall purpose of our implied consent statute *is not so much to protect the individual operator* of a motor vehicle from an otherwise reasonable search and seizure from his person, but rather, *to increase the incidence of consensual searches and seizures* on the part of the driving public through the taking of blood and breath samples for alcohol testing in a legislative effort to deter the operation of motor vehicles under the influence of intoxicating liquor and promote the safety of our highways.

*Bellino,* 390 A.2d at 1021 (emphasis added). The statute's emphasis has never been on protection of the individual driver. Indeed, with each set of amendments, any existing protection has declined.[9] The case law has

---

7. P.L.1939, ch. 273, provided for evidentiary use of statutory percentages of alcohol in the blood but stated:

 failure of a person accused of this offense [OUI] to have tests made to determine the weight of alcohol in his blood shall not be admissible in evidence against him.

8. P.L.1969, ch. 439, § 1312(2). In response to a legislative request prior to the enactment of the implied consent statute, the justices stated that the statutory provision for license suspension upon refusal to take a test would not be penal. Because a driver's license is a privilege, not a right, the State may attach conditions to that privilege "for valid reasons involving public safety." *Opinion of the Justices,* 255 A.2d 643, 649 (Me.1969).

9. For example, subsection 6 previously stated that a law enforcement officer could take a sample specimen "with the consent of the person from whom the sample is to be taken." The type of consent required was often litigated. *See State v. Plante,* 417 A.2d 991, 993–94 n. 2 (Me.1980). The consent language was deleted in 1981. P.L.1981, ch. 458; P.L.1981, ch. 475.

Subsection 1 previously provided that if an officer failed to inform the driver of the consequences of a refusal to take a test, the test results were inadmissible. Subsection 1 now provides that no test results shall be excluded because the officer fails to give the driver necessary information. P.L.1979, ch. 701.

The first paragraph of section 1312 previously provided that a person would be deemed to have given consent to a test "if arrested for operating or attempting to operate a motor vehicle while under the influence ..." That language was deleted and now reads: "if there is probable cause to believe he has operated or attempted to operate a motor vehicle while under the influence ..." P.L.1981, ch. 475; *see also* P.L.1981, ch. 468; P.L.1981, ch. 679 (effective April 15, 1982).

The penalty provisions of § 1312, which provided for an increasingly more severe fine and/or period of imprisonment for second and third convictions, were repealed in 1981. P.L. 1981, ch. 468. New §§ 1312–B and 1312–C were enacted providing mandatory incarceration and fines for four categories of "criminal" OUI, § 1312–C(5)(A), (B), (C), and (D). The prosecutor has no discretion to charge under

reflected this legislative policy.[10]

The statute's emphasis has, instead, been on providing the availability of reliable evidence of a driver's sobriety; the statute's "specific purpose was to *induce* reluctant arrested drivers to submit to one of two statutorily approved methods of determining their blood-alcohol level by providing sanctions in the nature of license suspensions for refusal...." *State v. Ayotte,* 333 A.2d 436, 439 (Me.1975) (emphasis added). The element of coercion in the statute was not unintended;[11] once the statute comes into play and the driver is stopped, the only decisional options the Legislature intended to allow under the implied consent statute are (1) whether to exercise the power to refuse to submit to the test and suffer an administratively imposed penalty and (2) failing exercise of that power, *which test* will be taken to provide the evidence needed to achieve the collective goals of deterring drunk driving and promoting highway safety. We have consistently noted that

drivers have only the power, and not the right, to revoke implied consent to a test. Moreover, this power has nothing to do with any rights under the Federal and State Constitutions. *Plante,* 417 A.2d at 994; *Van Reenan,* 355 A.2d at 395. The Legislature did not contemplate that a driver facing an OUI charge could decide, perhaps with the advice of counsel, the best course of action *for him* under the circumstances, that is, test or no test.[12]

Since 1969, the Legislature has made it increasingly clear that the people of Maine can avoid the stringent requirements of the implied consent statute in two ways: by choosing not to drink and/or by choosing not to drive. That initial choice is the driver's true decision under the statute. We know of few other areas in which the Legislature has so tenaciously pursued its avowed goals, perceived to be in the interests of the citizens of Maine. Considering the continual legislative attention this statute has received since its enactment and

the "civil" OUI provisions of § 1312–C(1) & (2) if dealing with a defendant who fits under the categories of § 1312–C(5).

**10.** *Plante,* 417 A.2d at 994 (defendant's power to refuse a test is not equivalent to rights created by federal and state constitutions); *State v. Carey,* 412 A.2d 1218, 1221 (Me.1980) (purpose of law was to increase availability of reliable evidence concerning true state of driver's sobriety); *State v. Copeland,* 391 A.2d 836, 838 (Me.1978) (defendant entitled only to reasonable opportunity to procure blood test); *Bellino,* 390 A.2d at 1020 (defendant has power, as opposed to right, to withdraw otherwise implied consent to test, with statutory consequences); *State v. Deering,* 384 A.2d 447, 448 (Me.1978) (defendant has "statutory right" to select between available tests but law does not guarantee available facilities); *State v. Banks,* 382 A.2d 1391, 1391 (Me.1978) (no constitutional problem in failing to inform that test results could be used against defendant in court; consent to test valid); *State v. Allen,* 377 A.2d 472, 474 (Me.1977) (officer has no constitutional duty to assist affirmatively defendant in obtaining test); *Van Reenan,* 355 A.2d at 395 (driver has no right to deny State use of specimen for test); *State v. Granville,* 336 A.2d 861, 863 (Me.1975) (decision to take tests rests with person arrested); *State v. Ayotte,* 333 A.2d 436, 439 (Me.1975) (statute intended to strengthen law enforcement); *State v. Roberge,* 306 A.2d 13, 16–17 (Me.1973) ("[g]overnmental interests

and needs in the appropriate administration and enforcement of the 'Implied Consent Law' are markedly different, qualitatively and quantitatively, from those of the citizens upon whom the law operates"); *State v. Stevens,* 252 A.2d 58 (Me.1969) (because blood-alcohol test does not violate fifth amendment, right to counsel not necessary to protect privilege against self-incrimination, citing *Schmerber v. California*); *State v. Munsey,* 152 Me. 198, 202, 127 A.2d 79, 82 (1956) (defendant has right to have reasonable opportunity to attempt to gather desired evidence, not right to have test).

**11.** As noted, the first paragraph of § 1312 previously provided that any person stopped for OUI "shall be deemed to have given consent to a chemical test...." That language was deleted; the amended language provides that such a person shall "have *the duty* to submit to a test ... *the duty* to submit to a blood-alcohol test includes *the duty* to complete either a blood or breath test." P.L.1981, ch. 679 (effective April 15, 1982) (emphasis added).

**12.** The very title of the statute refutes the proposition that once the police stop a driver suspected of OUI, fundamental decision-making concerning whether to submit to any test will begin.

considering that the Legislature has expressly provided for reasonable access to a particular physician on request, we are convinced that if the Legislature had intended to provide access to counsel prior to test, the Legislature would have so provided.[13] We find no requirement, constitutional or statutory, for such access to counsel. In the face of the legislative mandate, we are unwilling to supply that requirement by court rule.

The entry is

Appeal sustained.

Granting of the defendant's motion to suppress is reversed.

Remanded for entry of an order denying the motion to suppress.

All concurring.

---

**13.** Under the legislative mandate, which encompasses the imposition of a *duty* to submit to a test, it seems doubtful that counsel is necessary to assist the suspect in choosing between a blood and a breath test. Although, as the Michigan Court of Appeals noted, when faced with this issue, "[t]he mere allowing of a reasonable phone call to counsel prior to administering the test would be a more commendable practice on the part of the police," *Holmberg,* 60 Mich.App. at 760, 231 N.W.2d at 544, that Court did not find, nor do we, that the phone call is required.